Nelson C. CAMERON, Jr., and Helen S. Cameron, Plaintiffs-Appellees-Cross Appellants,

v.

OUTDOOR RESORTS OF AMERICA, INC., etc., et al., Defendants-Appellants-Cross Appellees,

Associates Capital Corp., etc., et al., Defendants-Appellees.

Joseph E. KARL and Dorothy A. Karl, Plaintiffs-Appellees-Cross Appellants,

v.

OUTDOOR RESORTS OF AMERICA, INC., etc., et al., Defendants-Appellants-Cross Appellees,

Associates Capital Corp., etc., et al., Defendants-Appellees.

No. 77–2312.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1979.

Opinion On Rehearing Feb. 4, 1980. See 611 F.2d 105.

190

Ted R. Brown, Orlando, Fla., for defendants-appellants-cross appellees.

Ted R. Brown, Orlando, Fla., for defendants-appellants-cross appellees.

Trapp & Black, A. Clifton Black, J. Thomas Cardwell, Orlando, Fla., for plaintiffs-appellees-cross appellants.

Harlan Tuck, Orlando, Fla., for Associates Capital Corp.

Before BROWN, CHARLES CLARK and VANCE, Circuit Judges.

VANCE, Circuit Judge:

Outdoor Resorts of America, Inc., and several of its officers and agents, were found to have violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 under that provision, 17 C.F.R. § 240.10b–5, and to have committed

common law fraud. Suit was brought by two investors, Joseph E. Karl and Nelson Cameron, who alleged that they were induced to invest in condominium campsites by materially misleading projections of rental income made by Outdoor Resorts and its agents. We agree with the district court's conclusions that the multiple campsite packages constituted securities, that controlling persons are liable for agents' misrepresentations, and that an assignee acting in good faith and without knowledge of securities law violations can enforce the mortgages and notes. The district court failed to make sufficient findings as to whether for security law purposes the misrepresentations were made with scienter. We conclude, however, that its holding that the same defendants are equally liable for common law fraud is not clearly erroneous. We therefore affirm its judgment both in favor of plaintiffs and in favor of Associates Capital Corp. on its counter claim.

## I.

As it must be viewed on appeal the record discloses the following facts:

Outdoor Resorts had developed an outdoor campsite in Gatlinburg, Tennessee, and by October 1971 was constructing a similar condominium campsite near Orlando, Florida. At the Orlando campsite it planned to offer for sale nearly 1,000 lots. The lots were to have utility connections, and the campsite was to have swimming areas, parks, a golf course and tennis courts by late December 1972, and a recreational hall by July 1973. The company directed sales of these condominium campsites primarily toward individual sales for the purchaser's own recreational use. The declaration of condominium gave Outdoor Resorts the exclusive right to rent the campsite in the absence of the owner and his guests with the owner paying the condominium fees, utility expenses, and property taxes and receiving half of the rental income from his lot. Rental income was determined by campers' choices of a particular lot rather than by Outdoor Resorts' pooling of all rental income or its random assignment of lots.

Karl learned of the Orlando campsite when he stopped his motor home at Outdoor Resorts' Gatlinburg campsites where he owned two lots. Two Outdoor Resorts salesmen, Bill Kirk and Earl Carver, described the Orlando development and projected a rental rate of $10 nightly and an occupancy rate of eighty percent. Karl then told his friend, Cameron, about the Orlando campsite, and they arranged to meet Kirk and Carver there to discuss a multiple lot purchase.

Several agents of Outdoor Resorts at the Orlando site made representations to Karl and Cameron about the income potential of campsite investment during their visit on October 25 and 26, 1971. George Gaines, then the national sales manager, had prepared a statement of projected cash flow and had passed it to Carver and to George Blackburn, the construction manager. Carver showed the statement to Karl at Gatlinburg, then Blackburn discussed it during the Orlando visit. This statement asserted that the campsites would enjoy "80% Occupancy Due to Location" and would produce "$5.00 Day" (as the owner's one-half share of its rental income) beginning in June 1972. It showed that the rental income would cover the debt payments beginning in June 1972 for a block of twenty campsites. A secretary of Outdoor Resorts handed Cameron an identical statement, which Carver had caused to be prepared. This statement set forth the same assumptions about occupancy and rental rates after about six months and rental coverage of debt payments. Carver and Kirk told Karl and Cameron that the company expected eighty percent occupancy and $10 rental nightly. Blackburn made these same representations on giving Karl the statement, although he denied having represented that this was probable for the near future. Gaines discussed the statement with Karl and Cameron, although he also mentioned the possibility of a fifty percent occupancy rate.

On October 26, 1971, Karl purchased twenty-five lots and Cameron purchased twenty at $6,000 each, and they executed

# 192

notes and purchase money mortgages for most of this sum. Their purpose for investment manifestly was realization of rental income, and Outdoor Resorts knew of that purpose. The district court found that Karl and Cameron relied on Outdoor Resorts' representations and that the representations induced their investment. It also determined that Outdoor Resorts realized the lack of a factual basis to estimate occupancy or rent, on the basis of statements to that effect by its president, E. Randall Henderson, Jr., its chairman of the board, Albert W. Johnson, and its corporate secretary (also a director), Ben Kingree.

Outdoor Resorts assigned the notes and mortgages to Associates Capital Corp. Associates did not participate in the misrepresentations or know of them at the time. The campsite's rental income fell far short of the projected level that would cover the debt payments. Karl and Cameron subsequently defaulted on the notes and mortgages.

Karl and Cameron brought suits demanding rescission of the campsite contracts for violation of Section 10(b) of the Securities Exchange Act and Rule 10b–5 under that provision, and for commission of common law fraud. The district court found that Section 10(b) and Rule 10b–5 were violated by Outdoor Resorts, Kirk, Carver, Blackburn, Gaines, and Henderson as a controlling person, and that common law fraud was committed by all but Henderson.[1]

## II.

### A. Condominium Campsite Blocks as Securities

 An investment contract, which is a type of security under the Securities Ex-

change Act, § 3(a)(10), 15 U.S.C. § 78c(a)(10), is defined as

> a contract, transaction, or scheme whereby a person invests his money in [1] a common enterprise and is led to [2] expect profits [3] solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). *Accord, SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 477 (5th Cir. 1974). All three elements must be present for a land contract to constitute a security. A contract to purchase residential or recreational property "when a purchaser is motivated by a desire to use or consume the item purchased" does not come within the securities law. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). *Accord*, SEC Release No. 33–5347, 17 C.F.R. § 231.5347, 38 Fed.Reg. 1735, 1736 (Jan. 18, 1973).[2] On the other hand, an offering of condominium units constitutes an offering of securities if it involves (1) both a rental arrangement and sales emphasis on the economic benefits to the purchaser from the managerial efforts of the promoter or third parties; (2) a rental pool arrangement; or (3) material restrictions on the owner's occupancy or rental of his unit, such as a requirement for making the unit available for rental for part of the year or a requirement for using an exclusive rental agent. *Id.* The sale of the condominium campsite blocks involved

---

1. Karl and Cameron also alleged violation of Section 7(c) of the Securities Exchange Act, 15 U.S.C. § 78g(c), and Regulation T under that provision, 12 C.F.R. § 220; of Section 12(2) of the Securities Act, 15 U.S.C. § 77*l*(2); and of the Florida securities law and its land sales act. The district court found no violation of Section 78g or Regulation T, and a statute of limitations bar to the Section 12(2) claim and the state law claims. The conclusions on these issues have not been appealed.

2. Similarly, a contract to purchase recreational lots in a subdivision development that is not under a rental arrangement or occupancy restrictions does not meet the definition of an investment contract because it is not part of a common enterprise. *Woodward v. Terracor*, 574 F.2d 1023, 1025–26 (10th Cir. 1978); *Happy Investment Group v. Lakewood Properties, Inc.*, 396 F.Supp. 175, 178–80 (N.D.Cal.1975). *See also Tahoe Racquet Club Condominiums*, [1976] Fed.Sec.L.Rep. (CCH) ¶ 80,718; *Sunriver Properties, Inc.*, [1974] Fed.Sec.L.Rep. (CCH) ¶ 79,691.

both a rental arrangement with sale emphasis, in the case of the multiple-unit sales to Karl and Cameron, on rental benefits from other persons' management, and material restrictions on the owner's rental through the exclusive agency provision. The offering of these campsite blocks therefore constituted an offering of a security under the Securities Exchange Act, as an examination of the three factors under *Howey* makes clear.

First, these condominium campsite blocks involved investment in a common enterprise. The crucial factor is that "the fortunes of all investors are inextricably tied to the efficacy" of common management and promotion. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d at 479. *Accord, SEC v. W.J. Howey Co.*, 328 U.S. at 300, 66 S.Ct. 1100. The benefit to Karl from twenty-five lots and to Cameron from twenty was inextricably wedded to the success of Outdoor Resorts' rental business including its advertising and management. It is irrelevant that these owners might have refused to rent out their campsite lots or rented the sites out themselves. *E. g., SEC v. W.J. Howey Co.*, 328 U.S. at 295, 66 S.Ct. 1100 (investor could enter service contract with different company); *Blackwell v. Bentsen*, 203 F.2d 690, 691–92 (5th Cir. 1953), *cert. dismissed*, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954) (investor could sell produce from his own lot). It is also not controlling that the rental income varied with the individual owners' lots, depending on which campsites tourists chose, and that the income was not evenly divided from a rental pool. *E. g., SEC v. W.J. Howey Co.*, 328 U.S. at 296, 66 S.Ct. 1100, *rev'g*, 151 F.2d 714, 717 (5th Cir. 1945) (investor's return depended on fruit production of own grove); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d at 479 ("that an investor's return is independent of that of other investors in the scheme is not decisive").

Second, the campsite blocks were purchased by Karl and Cameron for the expectation of profits. Karl obviously could not himself use twenty-five lots, and Cameron manifestly could not use twenty campsites (he did not even own a camping vehicle). It

is irrelevant that their investment purpose might have been profit from appreciation rather than from rent. "By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of [the] investors' funds . . . ." *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 852, 95 S.Ct. at 2060. *E. g., SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (appreciation).

Third, these condominium campsite blocks were purchased in the anticipation of profit to be derived from the efforts of others. The key issue is whether the managerial efforts are functionally essential or undeniably significant to that profit, and it is irrelevant that the investor does "nominal menial effort" that affects profit. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d at 480–81. *See also Bell v. Health-Mor, Inc.*, 549 F.2d 342, 346 (5th Cir. 1977). Karl and Cameron could not rent out their own lots. Outdoor Resorts was functionally responsible for their rental income through that company's promotion and management.

We conclude, therefore, that these condominium campsites as sold in multiple-unit blocks to Karl and Cameron constituted securities.

### B. *Violation of Section 10(b) and Rule 10b–5*

Section 10(b) forbids "any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations" in connection with a security transaction. 15 U.S.C. § 78j(b). Rule 10b–5 under that section prohibits employing "any device, scheme, or artifice to defraud," making "any untrue statement of a material fact" or omitting "a material fact necessary in order to make the statements made . . . not misleading," or engaging in "any act, practice, or course of business which operates . . . as a fraud or deceit" in connection with a security transaction. 17 C.F.R. § 240.10b–5. The elements of a Rule 10b–5 violation are a misrepresentation or

omission or other fraudulent device, the plaintiff's purchase or sale of securities in connection with the fraudulent device, the materiality of the misrepresentation or omission, the defendant's scienter in making the misrepresentation or omission, the plaintiff's justifiable reliance on the device (or due diligence against it), and the plaintiff's damages resulting from the fraudulent device. *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *Woodward v. Metro Bank*, 522 F.2d 84, 93 (5th Cir. 1975).

The sales representatives of Outdoor Resorts made the misrepresentation to Karl and Cameron that substantial rental income would result from an eighty percent occupancy rate, with a $5 nightly return, beginning in about six months, for the condominium campsites. They omitted the significant possibility that the occupancy rate might not be attained within six months and that Outdoor Resorts actually did not expect this high rate within the near future. The parties do not disagree that these misrepresentations and omissions were material, that they were justifiably relied upon, and that damages resulted. The appellants contend, however, that they were not made with scienter.

 Scienter, "a mental state embracing intent to deceive, manipulate, or defraud," is a vital element of a Section 10(b) or Rule 10b–5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *SEC v. Blatt*, 583 F.2d 1325, 1333–34 (5th Cir. 1978). "Negligence in failing to discover the falsity of the information is not actionable on this ground." *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). *Accord, Sargent v. Genesco, Inc.*, 492 F.2d 750, 761 (5th Cir. 1974). The trial court did not make an explicit finding of scienter and apparently found the appellants' negligence sufficient for a Section 10(b) and Rule 10b–5 violation. It found:

[T]he defendants Kirk, Carver, Gaines and Blackburn by the use of income projections, both verbal and in writing . . led the plaintiffs to believe that the developer of the lots, Outdoor Resorts of America, Inc., expected the lots to produce substantial income beginning in or about June 1972. At the same time [they] failed to inform the plaintiffs that the managing officers of the corporation did not expect such rental income from the lots within the foreseeable future—a fact which the evidence shows they knew *or in the exercise of slight care should have known*. Such conduct constituted a deceptive device in violation of 15 U.S.C. § 78j(b) and Rule 10b–5 and gives rise to *an inference of an intent* on the part of Messrs. Kirk, Carver, Blackburn and Gaines to deceive.

(Emphasis added). This does not constitute a finding with respect to the required scienter. If it were not for the parallel fraud claim based on the common law of Florida, the deficiency would necessitate that we remand this issue for the district court to make the necessary findings of scienter or lack of scienter for each appellant previously found to have violated Section 10(b) and Rule 10b–5.

### C. *Liability of Controlling Persons*

Section 20(a) of the Securities Exchange Act imposes liability on persons who directly or indirectly control persons liable under the Act unless the controlling persons "acted in good faith" and "did not directly or indirectly induce the act or acts constituting the violation." 15 U.S.C. § 78t(a). The district court found Outdoor Resorts and Henderson, its president, liable as controlling persons over Gaines, Blackburn, Kirk, and Carver. It found Johnson, the chairman of the board, not liable under the good faith exception.

 The district court finding that Henderson controlled the daily operations of Outdoor Resorts and that Gaines reported directly to him is not clearly erroneous. Henderson "failed to establish, maintain or diligently enforce a proper system of supervision and control" of Outdoor Resorts'

salesmen. *Del Porte v. Shearson, Hammill & Co.*, 548 F.2d 1149, 1154 (5th Cir. 1977). He as president with effective daily control was liable as a controlling person. *See, e. g., Drier v. Tarpon Oil Co.*, 522 F.2d 199, 200 (5th Cir. 1975) (under Securities Act); *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 694 (5th Cir. 1971) (same). The district court determination that Outdoor Resorts was liable as a controlling person is also not clearly erroneous.

■■■ The finding that Johnson, on the other hand, acted in good faith without inducing securities law violations and that he could not have "enforce[d] a system of control that would act as a curb on the sales personnel" is also not clearly erroneous. As a director without effective day-to-day control and without knowledge he was not liable as a controlling person. *E. g., Mader v. Armel*, 461 F.2d 1123, 1125–26 (6th Cir.), *cert. denied*, 409 U.S. 1023, 93 S.Ct. 465, 34 L.Ed.2d 315 (1972); *Moerman v. Zipco, Inc.*, 302 F.Supp. 439, 447 (E.D.N.Y.1969), *aff'd*, 430 F.2d 362 (2d Cir. 1970).

D. *Enforceability of Assigned Mortgages and Notes* •

■■■ Section 29(b) of the Securities Exchange Act provides that a contract made in violation or whose performance involves violation of the Act or rules under it is void toward the rights of the violating party and of "any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . ." 15 U.S.C. § 78cc(b). The district court in the instant case found that Associates Capital Corp., to which Outdoor Resorts assigned Karl's and Cameron's mortgages and notes, did not have knowledge of the securities law violations, and this finding was not clearly erroneous. Associates Capital had investigated Outdoor Resorts and its sales methods by having one individual pose as a prospective customer and listen to the sale talk and having others visit the Orlando construction

site. The district court correctly held that, after Outdoor Resorts rescinded the sales contracts with Karl and Cameron, Associates Capital could foreclose on the defaulted mortgages and notes of which it had taken assignment in good faith without actual knowledge of securities law violations.

## III.

■■■ The elements of common law fraud, under Florida law, are a false representation of material fact, with knowledge of the representation's falsity or a negligent representation without a reasonable basis, intent to induce reliant action, and damage resulting from justifiable reliance. *Entron, Inc. v. General Cablevision*, 435 F.2d 995, 997 (5th Cir. 1970); *Poliakoff v. National Emblem Insurance Co.*, 249 So.2d 477, 478 (Fla.Dist.Ct.App.), *cert. denied*, 254 So.2d 790 (Fla.1971). The knowledge requirement is met by Henderson, Gaines, Blackburn, Kirk and Carver, because negligence is sufficient under Florida law. *Emerson Electric Co. v. Farmer*, 427 F.2d 1082, 1087 (5th Cir. 1970); *Joiner v. McCullers*, 158 Fla. 562, 28 So.2d 823, 824 (1947).

■■■ The district court found as fact that Kirk and Carver told Karl and Cameron that "the management of Outdoor Resorts of America, Inc. *expected* eighty percent occupancy . . . after June of 1972 and a rental rate of $10.00 per night," which Blackburn confirmed, and ruled that "the defendants . . . led the plaintiffs to believe that the developer . . . expected the lots to produce substantial income." The court below also found that "the management of Outdoor Resorts of America, Inc. *knew that the company had no factual basis* on which . . . reasonably [to] estimate any particular occupancy rate or rental stream from the lots." (Emphasis added.) A promise of future action or a prediction of future events does not, standing alone, constitute the necessary false representation of an existing fact for common law fraud under Florida law. *Brod v. Jernigan*, 188 So.2d 575, 579 (Fla. Dist.Ct.App.1966); *see also Bower v. Selecman*, 52 So.2d 680, 681 (Fla.1951). How-

ever, these statements of Outdoor Resorts' expectation were representations of its present belief, and in light of Florida's negligence standard for common law fraud and the company's implication of superior knowledge, these present representations without a factual basis and with admitted inward skepticism were negligent misrepresentations constituting common law fraud under Florida law. *See, e. g., Bobby Jones Garden Apartments, Inc. v. Suleski,* 391 F.2d 172, 175 (5th Cir. 1968) (anticipated performance of air condition unit); *Poliakoff v. National Emblem Insurance Co,* 249 So.2d at 478 (no anticipated cancellation of insurance policy). The judgment in plaintiffs' favor is amply supported by the district court's findings and amended conclusions as to common law fraud, which we conclude are not clearly erroneous.

AFFIRMED.